# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

8 electronic devices currently on MPD Inventory #18012531 at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233, more fully described in Attachment A

Case No. 18-838 M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841 and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Jasemin Pasho, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: April 11, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jasemin Pasho being first duly sworn, hereby depose and state as follows:

### I. BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and a state certified law enforcement officer, currently assigned to the North Central High Intensity Drug Agency. I am federally deputized by the United States Department of Justice, Drug Enforcement Agency ("DEA"). Prior to my assignment at DEA/HIDTA, I have worked full time as a law enforcement officer for twenty-one and half (21 ½) years with the Milwaukee police Department and currently employed in the rank of Detective.

3. As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled

1

substances.

4. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods, which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

5. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from narcotics trafficking, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking.

6. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched is:

a. A Casio Verizon flip phone unknown number, (hereinafter Device A) recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #15 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

b. A Samsung Verizon flip phone, unknown number, (hereinafter Device B) recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #16 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

c. A LG black/bronze touch screen phone, unknown number, (hereinafter Device C), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #17 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

d. An LG black/bronze cracked touch screen phone, unknown number, (hereinafter Device D), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #18 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

e. A LG Silver touch screen, unknown number, (hereinafter Device E) recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #19 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

f. A Cool pad silver/gray phone, unknown number, (hereinafter Device F), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #20 and currently in evidence

at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

g.  An LG black/bronze cracked touch screen phone, unknown number, (hereinafter Device G), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #21 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

h.  An LG black/silver cracked touch screen phone, unknown number, (hereinafter Device H), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #22 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

## II. PROBABLE CAUSE

9. In August and September of 2017, case agents interviewed a confidential source (CS #1). CS #1 stated that s/he is in state custody for drug trafficking charges, including a heroin overdose death. CS #1 identified his source of supply of heroin as being Jimmy Bates, aka "Big Jim," or "Homie." CS #1 stated that BATES would charge $90 per gram of heroin and that CS #1 had bought up to 200 grams of heroin at a time from BATES. CS #1 stated that s/he had observed at least three "bricks" (kilograms) of heroin at one of BATES' stash houses located at North 43rd and Burleigh Street in the City of Milwaukee. CS #1 stated that BATES is smart and switches up his stash houses often. CS #1 stated that BATES had a 2012 Audi A7 that is a Christmas red and green custom color/paint job and that he also drives rental vehicles often. CS #1 stated that BATES has several associates, including "Big Nash," Justin STAMPS, Jesse aka "Budda," Willie Jordan, and Devon Wooten.

4

10. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since August of 2017. Second, the information CS #1 has provided is substantially against CS #1's penal interest. Third, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including information from other sources. CS #1 is in state custody for drug trafficking charges, including a heroin overdose death and is cooperating for consideration on those charges. CS #1 has a prior conviction for delivery of heroin. Finally, CS #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS #1 to be reliable.

11. In January of 2018, case agents interviewed another confidential source (CS #2). CS #2 stated that s/he had information regarding a homicide that occurred on approximately September 11, 2017. CS #2 stated that a victim with the nickname of "Bushwig" was murdered while in or near his car. CS #2 stated that the victim was shot several times and that it occurred in the area of 24th and Medford. CS #2 stated that the shooter was Daryl ROBERTS and that ROBERTS was with Jimmy BATES at the time of the shooting. CS #2 stated that, prior to the homicide, there was a shooting that occurred because of an argument between BATES and ROBERTS and "Bushwig" and that BATES and ROBERTS were shot at. CS #2 stated that BATES is a large-scale heroin distributor in the City of Milwaukee and that ROBERTS is a heroin dealer and ROBERTS obtains his

5

heroin from BATES. Review of Milwaukee Police Department reports reveal that a homicide occurred on September 11, 2017 at 2416 N 25th Street in the City of Milwaukee and the victim was "Bushwig" aka Shawn K Alford (B/M dob: 02/21/1976), who was a known heroin dealer. Case agents confirmed in early 2018, that there was a pending arrest warrant against Daryl ROBERTS, AKA "Lil D" for the homicide.

12. Review of Milwaukee Police Department reports reveal that homicide detectives determined that ROBERTS had been in a black 2009 Toyota Camry WI/PC/491ZHK, which was parked in the area of where the homicide occurred. The black 2009 Toyota Camry listed to Shinae N Castine (B/F dob: 10/27/1986), aka "CC." MPD homicide detectives located Castine at her apartment at 703 South 35th Street, Milwaukee, WI. MPD homicide detectives obtained a search warrant for Castine's residence and during their search recovered approximately 44.49 grams of heroin, and .21 grams of cocaine base. During interviews with MPD homicide detectives, Castine confirmed that she is Jimmy BATES' girlfriend and she stated that BATES had possession of her car during the time of the homicide on September 11, 2017 and that BATES was with Daryl ROBERTS.

13. For several reasons, case agents believe that CS #2 is reliable and credible. First, CS #2 has been providing continuous information since January of 2018. Second, the information provided by CS #2 is consistent with evidence obtained elsewhere in this investigation where CS #2 was not utilized, and substantial portions of CS #2's information has been corroborated through independent investigation, including information from other sources and law enforcement reporting. CS #2 is in state custody

6

for battery and strangulation charges and is cooperating for potential consideration on those charges. CS #2 has two prior felony convictions for armed robbery and a prior felony conviction for maintaining a drug trafficking place. For these reasons, case agents believe CS #2 to be reliable.

14. In February of 2018, case agents interviewed a confidential source (CS #3). CS #3 provided information regarding individuals who were involved in moving substantial amounts of heroin and cocaine in the Milwaukee area, including Jimmy BATES. CS #3 stated that Snowball, Juan, Howie, and Cameron Dowell were all members of BATES' drug trafficking organization in Milwaukee. CS #3 stated that BATES used to sell cocaine and heroin but was now strictly in the heroin business. CS #3 stated that it is not uncommon for BATES to pick up 4 kilograms of heroin at a time from his supplier in Chicago. CS #3 states that BATES pays $70,000-$75,000.00 per kilogram of heroin and cuts it up before selling it in Milwaukee.

15. CS #3 stated that BATES told CS #3 that "Lil D" (ROBERTS) killed a black male in Milwaukee that went by the street name, "Bushwick." CS #3 stated that Bushwick owed BATES money from prior heroin transactions so BATES sent Snowball (Calvin Nash) and Lil D (Darryl Roberts) to collect the debt for BATES. CS #3 said Snowball and Lil D didn't do the job right and Bushwick got access to a gun, shooting Snowball in the arm. CS #3 stated that Snowball was arrested because he was on probation, Lil D went back to BATES, and BATES was angry because they didn't collect the debt from Bushwick and allowed Bushwick to get a gun, resulting in Snowball getting shot. BATES sent Lil D to finish the job and Lil D found Bushwick and shot and killed

7

Bushwick. CS #3 stated that Lil D fled the area leaving the keys from the car he drove to the shooting. According to CS #3, a neighbor pointed the car out to police. CS #3 stated that the car was a black Maxima or Toyota and the car was linked to one of BATES' girls who was a schoolteacher.

16.     CS #3 stated that BATES' drug trafficking organization refer to themselves as, "Team Pyrex" and that BATES' crew members were referred to as, "Storm troopers" and "Enforcers." CS #3 identified Justin Stamps as "Blaze" or "Blade" and a member of BATES' organization, the 29th/Capital "Hardhead Crew," and further added Stamps moves between 100-200 grams of heroin for BATES. CS #3 positively identified Dujuan Harrison as "Juan" and as a member of BATES' crew moving smaller amounts of heroin and larger amounts of cocaine (potentially kilograms). CS #3 stated Harrison would middle heroin deals for BATES. CS #3 identified Calvin Nash as "Snowball," a member of BATES' crew and responsible for selling cocaine and heroin. CS #3 provided the phone number of 414-388-1505 as BATES' current phone number.

17.     For several reasons, case agents believe that CS #3 is reliable and credible. First, CS #3 has been providing information since February of 2018. Second, the information provided by CS #3 is substantially against his/her penal interests. Third, the information provided by CS #3 is consistent with evidence obtained elsewhere in this investigation where CS #3 was not utilized, and substantial portions of CS #3's information has been corroborated through independent investigation, including information from other sources and law enforcement reporting. CS #3 is cooperating for potential consideration on federal drug trafficking charges. CS #3 has a prior felony

8

conviction for second-degree reckless homicide. For these reasons, case agents believe CS #3 to be reliable.

18. On April 4, 2018, the Milwaukee Police Department's fugitive apprehension unit went to the address of 2636 North 24th Street to locate and arrest Daryl Roberts aka "Lil D" for the homicide of Ashford on September 11, 2017. Roberts was located in the attic of the duplex hiding from police and was arrested. MPD homicide detectives executed a state search warrant for 2636 N. 24th Street, 2018 on April 4, 2018 and recovered the following, all of which were placed on Milwaukee Police inventory: A Semi-auto Glock 45 caliber (loaded) and magazine were located in attic; a SGM tactical magazine located in attic; two digital scales were recovered from the kitchen; a Master Piece Arms gun box for a 9mm; a box of Winchester ammunition 40 caliber; 9mm luger cartridges were located in Walmart bag; a Casio Verizon flip phone; a Samsung Verizon flip phone; three LG Black/Bronze touch screen phones; an LG silver/touch screen phone; a Cool pad silver/grey phone; an LG Black/silver phone; a silver/black I-phone; a white powdery substance, suspected to be MDMA; and a green leafy plant-like substance, suspected to be marijuana.

19. MPD Homicide detectives interviewed the landlord regarding who had rented the upper unit at 2636 N 24th Street, and the landlord told MPD Homicide detectives that he had rented the unit to Jim Wallace and Wallace's wife, Pamela LeBlanc. The landlord stated that Wallace had told him that his mother Tiffany would be living at the residence. The landlord was shown a booking photo of Jimmy BATES and positively identified BATES as the individual who had identified himself as "Jim Wallace," and who

9

was renting the upper unit at 2636 N. 24th Street.

20. The Devices referenced in Paragraph 8 are currently in storage at the Milwaukee Police Department Property Section at 2620 W Wisconsin Ave, Milwaukee WI, 53233. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the Milwaukee Police Department, Criminal investigation Bureau- Homicide.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.
>
> b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage

10

media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet

11

through cellular networks, 802.11 "Wi-Fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

22. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications I know that some of the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. There is probable cause to believe that things that were once stored on Devices A through H, may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage mediums can provide evidence of a file that was once on the storage mediums but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage mediums that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

13

information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

14

## CONCLUSION

27. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in paragraph 8, and Attachment A to seek the items described in Attachment B.

# ATTACHMENT A

The property to be searched is:

1. The property to be searched is:

a. A Casio Verizon flip phone unknown number, (hereinafter Device A) recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #15 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

b. A Samsung Verizon flip phone, unknown number, (hereinafter Device B) recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #16 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

c. A LG black/bronze touch screen phone, unknown number, (hereinafter Device C), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #17 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

d. An LG black/bronze cracked touch screen phone, unknown number, (hereinafter Device D), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #18 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

e. A LG Silver touch screen, unknown number, (hereinafter Device E) recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #19 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

f. A Cool pad silver/gray phone, unknown number, (hereinafter Device F), recovered during the execution of a search warrant at 2636 North 24th Street,

Milwaukee, MPD Inventory#18012531 item #20 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

g. An LG black/bronze cracked touch screen phone, unknown number, (hereinafter Device G), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #21 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

h. An LG black/silver cracked touch screen phone, unknown number, (hereinafter Device H), recovered during the execution of a search warrant at 2636 North 24th Street, Milwaukee, MPD Inventory#18012531 item #22 and currently in evidence at the Milwaukee Police Department Property Section, 2620 West Wisconsin Avenue, Milwaukee, WI, 53233.

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of Title 21, United States Code, Section 841(a)(1) and 846:

   a. Electronic drug or money ledgers, drug distribution or customer lists and related identifying information, drug supplier lists (including names, addresses, phone numbers, or any other identifying information); correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   b. Electronic telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

   c. Records, items and documents stored on the Devices reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel from August 2012 to the present;

   d. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, checks, credit card records, safe deposit box records, records and receipts and rental agreements for storage facilities, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances.

e. Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, or other activities related to drug trafficking or money laundering.

f. Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.